## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

DAVID ROOKS,                          *

          Petitioner,               *

VS.                                   *          CASE NO. 5:05-CV-231 (CAR)
                                                 Social Security Appeal

JO ANNE BARNHART,                     *
Commissioner of Social Security,
          Respondent.               *

## REPORT AND RECOMMENDATION

The Social Security Commissioner, by adoption of the Administrative Law Judge's determination, denied Claimant's application for a period of disability and disability insurance benefits, finding that he was not disabled within the meaning of the Social Security Act and Regulations. Claimant contends that the Commissioner's decision was in error, and he seeks review under the relevant provisions of 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c). All administrative remedies have been exhausted.

## LEGAL STANDARDS

The court's review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence and whether the correct legal standards were applied. *Walker v. Bowen*, 826 F.2d 996 (11th Cir. 1987). Substantial evidence is defined as more than a scintilla and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971). The court's role in reviewing claims brought under the Social

Security Act is a narrow one.  The court may not decide facts, reweigh evidence, nor substitute its judgment for that of the Commissioner.[1]  *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).  It must, however, decide if the Commissioner applied the proper standards in reaching a decision.  *Harrell v. Harris*, 610 F.2d 355, 359 (5th Cir. 1980).  The court must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings.  *Bloodsworth v. Heckler*, 703 F.2d at1239.  However, even if the evidence preponderates against the Commissioner's decision, it must be affirmed if substantial evidence supports it. *Id.*   The initial burden of establishing disability is on the claimant.  *Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973).  The claimant's burden is a heavy one and is so stringent that it has been described as bordering on the unrealistic.  *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981).

A claimant seeking Social Security disability benefits must demonstrate that she suffers from an impairment that prevents her from engaging in any substantial gainful activity for a twelve-month period.  42 U.S.C. § 423(d)(1).  In addition to meeting the requirements of these statutes, in order to be eligible for disability payments, a claimant must meet the requirements of the Commissioner's regulations promulgated pursuant to the authority given in the Social Security Act.  20 C.F.R. § 404.1 et seq.

Under the regulations, the Commissioner determines if a claimant is disabled by a

---

[1]Credibility determinations are left to the Commissioner and not to the courts.  *Carnes v. Sullivan*, 936 F.2d 1215, 1219 (11th Cir. 1991).  It is also up to the Commissioner and not to the courts to resolve conflicts in the evidence.  *Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986).  See also *Graham v. Bowen*, 790 F.2d 1572, 1575 (11th Cir. 1986).

five-step procedure. 20 C.F.R. § 404.1520, Appendix 1, Part 404. First, the Commissioner determines whether the claimant is working. Second, the Commissioner determines whether the claimant has an impairment which prevents the performance of basic work activities. Next, the Commissioner determines whether the claimant's impairment(s) meets or equals an impairment listed in Appendix 1 of Part 404 of the regulations. Fourth, the Commissioner determines whether the claimant's residual functional capacity can meet the physical and mental demands of past work. Finally, the Commissioner determines whether the claimant's residual functional capacity, age, education, and past work experience prevent the performance of any other work. In arriving at a decision, the Commissioner must consider the combined effect of all the alleged impairments, without regard to whether each, if considered separately, would be disabling. *Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984). The Commissioner's failure to apply correct legal standards to the evidence is grounds for reversal. *Id.*

## ISSUES

I.    **Whether the ALJ improperly assessed Claimant's earnings for the years 2000, 2001 and 2002?**

### Administrative Proceedings

Claimant filed his second application for social security benefits on April 7, 2003. (R-45). His application for benefits was denied initially and upon reconsideration. Claimant then requested a hearing which was held on March 16, 2004. (R-272-309). The ALJ granted Claimant's application for benefits from November 22, 2002, forward and denied Claimant's

application to the extent that it attempted to re-open his first application by amending the onset date to November 1, 1999. (R-45-50). Claimant then requested review of the ALJ's decision by the Appeals Council. Thereafter, on April 29, 2005, the Council issued an order denying review, making it the final decision of the Commissioner. (R-5-7).

## Statement of Facts and Evidence

The Claimant and Commissioner are in agreement that Claimant is disabled as of November 22, 2002, and there are no issues as to the impairments which caused the disability. The ALJ found, however, that Claimant engaged in substantial gainful work activity from his amended onset date of November 1, 1999, until November 22, 2002. (R-47).

## I.   Whether the ALJ improperly assessed Claimant's earnings for the years 2000, 2001 and 2002?

The ALJ determined that Plaintiff's disability claim for the time prior to November 22, 2002, was precluded at Step 2 of the sequential evaluation process. (R-49). Claimant argues that the ALJ improperly evaluated his "countable earnings" for 2000, 2001, and 2002, and failed to use the mandatory procedures under 20 C.F.R. §404.1574. (Claimant's Brief, p.6-12). The Commissioner argues that the ALJ considered testimonial and other evidence and properly found that Claimant's work activity from November 1999, to November 22, 2002, was substantial gainful activity with accommodations for his physical activity and not sheltered work. (Commissioner's Brief, p.4). The Commissioner concedes that the ALJ did not apply the criteria regarding comparability or value of services, but argues that the statute

4

stated that they "may" apply the procedures and that they were not required to apply them. *Id*. at 5.   The Commissioner argues that the ALJ's failure to apply these tests should be considered harmless error, at most.  *Id*.

As previously stated, the ALJ found that the affidavits provided and testimony given did not support a finding of "sheltered employment" for Claimant.  (R-47).   According to the regulations, the ALJ is absolutely correct, "[s]heltered employment is employment provided for handicapped individuals in a protected environment under an institutional program." S.S.R. 83-33.   However, even if the ALJ intended to state that the testimony regarding Claimant's work for 2000, 2001, and 2002, was not the <u>equivalent</u> of sheltered employment, the ALJ was still required to consider any special conditions in the workplace.  In *Brown v. Barnhart*, Plaintiff Brown claimed that his employment as a desk clerk with the City of Pembroke Pines "should not be considered past relevant work because it was a sheltered job that was essentially created specially for him after his knee injury.  410 F. Supp. 2d 1287, 1297 (S.D. Fla. 2006).   The ALJ in *Brown* found that there was "no evidence in the record that suggests that the claimant's desk job was the equivalent of a sheltered desk job."  *Id*. The court pointed out that "sheltered employment is work 'provided for handicapped individuals in a protected environment under an institutional program.'" *Brown v. Barnhart*, 410 F. Supp. 2d at 1298; See *Programs Operations Manual System* ("POMS") §DI 10505.020.B.2[2].   The court discussed the functions of sheltered workshops and then stated

_____

[2]  The court stated that "POMS is a primary source of information used by Social Security employees to process claims for Social Security benefits and is located online at http:policy.ssa.gov."

that in addition to sheltered workshops, the most common types of sheltered employment includes "hospitals, Veteran's Administrations domiciliaries, long-term care institutions, and homebound employment." *Brown v. Barnhart*, 410 F. Supp. 2d at 1298.  The court found that:

> Such work may be performed under special conditions, including receiving of special assistance from other employees, irregular work schedules, additional rest periods, special equipment, lower expectations of productivity, or work allowed based on family relationship, past association with the employer, or the employer's concern for the individual's welfare.

*Id*.  See 20 C.F.R. §404.1573(c).  The court in *Brown* recognized that "job coaching and like assistance," as described in POMS, may also be a special condition of employment.  *Id*.  See POMS §DI 10505.010.A.4.  The court also found that these special conditions were "not technically 'subsidies,' but are considered in evaluating the value of the employee's work to determine whether the work was performed at the substantial gainful activity level."  *Id*.  Thus, once the ALJ had information as to Claimant Rook's special assistance, he should have used the requisite tests to determine whether any of Claimant's earnings should not be counted due to the value of his work versus the actual work performed by Claimant.  Furthermore, while the phrase "sheltered" may have been used by the ALJ and the witnesses, the evidence clearly suggests that Claimant and his witnesses were actually providing information as to a "subsidy" as defined in 20 C.F.R. §404.1574.

---

*Brown v. Barnhart*, 410 F. Supp. 2d at 1298, FN. 6.

The Commissioner argued that substantial evidence supports the ALJ's finding that Claimant's work activity constituted SGA for the aforementioned years.  In making this argument, the Commissioner stated, "[c]ontrary to Plaintiff's assertions, the ALJ was not required to apply the tests of comparability or worth in this instance since his earnings exceeded the Earnings Guideline."  (Commissioner's Brief, p.8 citing to 20 C.F.R. §§404.1574 and 416.974).  However, §404.1574, which is entitled "Evaluation guides if you are an employee" states:

> (a) We use several guides to decide whether the work you have done shows that you are able to do substantial gainful activity. If you are working or have worked as an employee, we **will** use the provisions in paragraphs (a) through (d) of this section that are relevant to your work activity. . . .
> (1) *Your earnings may show you have done substantial gainful activity*.  Generally, in evaluating your work activity for substantial gainful activity purposes, our primary consideration will be the earnings you derive from the work activity.  We will use your earnings to determine whether you have done substantial gainful activity **unless we have information from you, your employer, or others that shows we should not count all of your earnings**. . . .
> (2) *We consider only the amounts you earn*.  When we decide whether your earnings show that you have done substantial gainful activity, we do not consider any income that is not directly related to your productivity.  When your earnings exceed the reasonable value of the work you perform, we consider only that part of your pay which you actually earn.  If your earnings are being subsidized, we do not consider the amount of the subsidy when we determine if your earnings show that you have done substantial gainful activity.  We consider your work to be subsidized if the true value of your work, when compared with the same or similar work done by unimpaired persons, is less than the actual amount of earnings paid to you for your work.  For example, when a person with a serious impairment does simple tasks under close and continuous

supervision, our determination of whether that person has done substantial gainful activity will not be based only on the amount of the wages paid.  We will first determine whether the person received a subsidy; that is, we will determine whether the person was being paid more than the reasonable value of the actual services performed.  We will then subtract the value of the subsidy from the person's gross earnings to determine the earnings we will use to determine if he or she has done substantial gainful activity. . . .

(b) *Earnings guidelines*.  (1) *general*.  If you are an employee, we first consider the criteria in paragraph (a) of this section and §404.1576, and then the guides in paragraphs (b)(2), (3), (4), (5), and (6) of this section. . . .

(5) *If there is evidence showing that you may have done substantial gainful activity*.  If there is evidence showing that you may have done substantial gainful activity, **we will apply the criteria in paragraph (b)(6) of this section regarding comparability and value of services.**

(6) *Earnings that are not high enough to ordinarily show that you engaged in substantial gainful activity.* . . .

(iii) *Examples* of other information we may include, whether –

(A) Your work is comparable to that of unimpaired people in your community who are doing the same of similar occupations as their means of livelihood, taking into account the time, energy, skill, and responsibility involved in the work, and

(B) Your work, although significantly less than that done by unimpaired people, is clearly worth the amounts shown in paragraph (b)(2) of this section, according to pay scales in your community.

20 C.F.R. §404.1574 (bold added for emphasis, italics in the original).  Thus, in a case such as this one, the regulations state that if it appears a claimant may have been engaged in substantial gainful activity and the Social Security Administration receives information that they should not count all of a claimant's earnings, then the process requires that the administration apply the comparability and value of services tests to determine countable earnings.   The Commissioner concedes that the ALJ did not apply these criteria.

8

(Commissioner's Brief, p.5).  The ALJ's simple determination that the testimony given "did not support sheltered employment, however, but rather indicates that the claimant's employers accommodated his physical limitations during the period in question,"  was not enough to fulfill the ALJ's duty under 20 C.F.R. §404.1574.  (R-47).  Moreover, the ALJ makes no mention, whatsoever, of a possible subsidy.  (R-45-50).

Additionally, S.S.R. 83-33 states:

> The SGA Earnings Guidelines are a basis for evaluating whether an individual engaged in SGA.  Evaluation of work activity for SGA purposes is concerned with only those earnings which represent a person's own productivity.  **Therefore, before applying the Earning's Guidelines, it is necessary to ascertain what portion of the individual's earnings represents the actual value of the work he or she performed.**  To do so, the adjudicator must first determine the individual's gross earnings, i.e., the total earnings reported for work activity.  Gross earnings include payments in kind (e.g., room and board) which are made for the performance of work in lieu of cash.  Once gross earnings are determined, it is necessary to deduct the value of any subsidized earnings provided by the employer and the amount of certain impairment- related work expenses (IRWE) paid by the employee. . . .
> A. Determining "Countable Earnings."
> Subsidized earnings and IRWE must be deducted from gross earnings in order to ascertain "countable earnings."  These issues are discussed below.
> 1.  **Subsidies.  An employer may, because of a benevolent attitude toward a handicapped individual, subsidize the employee's earnings by paying more in wages than the reasonable value of the actual services performed.  When this occurs, the excess will be regarded as a subsidy rather than earnings.**
> In most instances, the amount of a subsidy can be ascertained by comparing the time, energy, skills, and the responsibility involved in the individual's services with the

9

same elements involved in the performance of the same or similar work by unimpaired individuals in the community and estimating the proportionate value of the individual's services according to the prevailing pay scale for such work.

When precise monetary evaluation is not feasible, it may be possible to determine the approximate extent of a subsidy on the basis of gross indications of a lack of productivity; for example, when unusual supervision or assistance is required in the performance of simple tasks, or the employee is extremely slow, inefficient or otherwise unproductive. . . .

**a. The following circumstances indicate the strong possibility of a subsidy:**

(1) The employment is "sheltered;" or

(2) Childhood disability is involved; or

(3) Mental impairment is involved; or

(4) There appears to be a marked discrepancy between the amount of pay and the value of the services; or

**(5) The employer, employee, or other interested party alleges that the employee does not fully earn his or her pay (e.g., the employee receives unusual help from other ins doing the work) . . .**

b. Employer Calculates Subsidy.  An employer desiring to subsidize the earnings of handicapped workers may designate a specific amount as such, after figuring the reasonable value of their services.  Such a calculation is more likely to be made by an institutional employer, such as a sheltered workshop, than by a private employer.  However, regardless of the type of employer, an adequate explanation as to how a specific subsidy was calculated will normally suffice without the additional development indicated in c., below.

c. Nonspecific Subsidies.  If the employer cannot furnish a satisfactory explanation identifying a specific amount as a subsidy, **then it will be necessary to obtain answers to the questions outlined in this section.**  When this is necessary, the employer should be informed that the questions are asked in the interest of the employee for the purpose of determining his or her "countable earnings." . . .

S.S.R. 83-33.  (bold added for emphasis).  The ruling then includes specific questions to be

asked of the employer regarding a need for services: why was the individual hired; what are the individual's job duties; how much time does the individual spend on those duties; who did the job before the individual was hired and how much time did that person spend on the duties of the job; if the individual were separated from the job, would he or she be replaced, if so, how much time would the replacement spend on the individual's duties; how often is the individual absent from work; does someone else do the individual's work when he or she is absent; and how much time does the temporary replacement take to do the individual's job. *Id*. Said subsection also has requisite questions to be asked regarding the relationship of pay to services: how are the individual's total earnings computed; is the individual's pay reduced proportionately when he or she is absent from work (compare the employer's practice concerning the impaired individual to that which applies to unimpaired workers, explaining any difference); does the individual receive any unusual assistance or supervision (describe); if the individual's pay is not set according to normal business practices, what consideration is given to the size of the individual's family, number of years of past service with the employer, previous earnings, friendship or relationship to the employer, or other factors unrelated to the performance of work; does the employer consider the individual's work to be worth substantially less than the amount paid and, if so, what are the employer's reasons for this view (Give the employer's estimate of the value of the services and explain how this estimate was reached); if the individual is still on the payroll despite unsatisfactory work, what is the employer's reason for retaining him or her; and if the individual is no longer employed, what led to the termination of employment. *Id*.

Although Claimant's earning record establishes that he made in excess of the monthly limits for the years 2000, 2001, and 2002, creating a rebuttable presumption that he was performing substantial gainful activity, there is evidence in the record to indicate that Claimant's income was either subsidized or that Claimant's work was the equivalent of sheltered employment.  The testimony given by Claimant, his co-workers and the affidavits from his employers indicate that Claimant's earnings may have been subsidized.   At the hearing before the ALJ, Claimant was questioned by the ALJ and gave testimony that his employment was "sheltered":

> Q      So you were doing the same thing?
> A.     Yes, sir.
> Q.     Okay.  Well, how was this sheltered employment?  How was it that you were earning money like you did before the surgery?
> A.     Some things – well, some days I worked two or three hours and go home until I get to hurting, and I can't sit longer at time because of the back problem.
> Q.     Okay.  So you're just saying they just let you off early?
> A.     Yes, sir.
> Q.     Okay.  Well, why did you finally stop working these jobs?  I guess the last one was Noble?
> A.     Well, basically health problems, because, you know, they had to find something for me to do at Noble –
> Q.     Uh-huh.
> A.     He had to keep finding something for me to do – odd jobs.
> Q.     Uh-huh.
> A.     And he said he couldn't keep doing that.  He couldn't keep affording to pay me to just hang around.
> Q.     So he let you go?
> A.     Yes, sir.  [INAUDIBLE] letting go. . . .
>
> Q.     Okay.  Before you did the ticket – the whole time you were at Noble, were you doing the same job?

A.   Yes, sir.

Q.   With the tickets and the same at Mid-South?

A.   Yes, sir.

Q.   The whole time you were there?  And how many years did you work for these people?

A.   Off and on, '87 to 2002 for the [INAUDIBLE] and Captain Mowing.

Q.   Okay.  And were you related to – or know the people at Captain Mowing.  I mean, why did they hold you on when you couldn't drive the tractor for enough to pay you $5,760 if they hired you to do a job and you couldn't do it?

A.   I've known the boss man for five years.  I guess he did the [INAUDIBLE], I don't know.

Q.   Okay.

A.   [INAUDIBLE].

Q.   The boss man was a friend of your?

A.   Yes, sir.

Q.   Now, is that – did he own the company?

A.   He was part owner.

Q.   Part owner.  Okay.  Who was the other owner?

A.   Sharon Hickens and Zeke Pedi.

Q.   Okay.  Did they know you were –

A.   Yes, sir.

Q.   – working and not being – doing anything?

A.   Yes, sir.

Q.   Okay.  And what about Noble and Mid-South?  Were they – was it the owner of the company that was letting you do this?

A.   Yes, sir.

Q.   Because these are all corporations?

A.   Yes, sir.

Q.   And were they owned by one person?  Was it a closely held corporation or what?

A.   Well, [INAUDIBLE] they done this for years – I think four or something years or longer?

Q.   Okay.  And what about Mid-South?

A.   It's owned by so many farmers – 13 farmers.  [INAUDIBLE] in '78, you know.

Q.   Okay.

A.   They know my limit and abilities.

(R-282-285).

EXAMINATION OF CLAIMANT BY ATTORNEY:

Q.    When you have done your work – and I'm talking about since '99, when you've done the work for the cotton gin and Mid-South Coop. and Captain Mowing, were you allowed to rest in – while you worked?

A.    Yes, sir.  Sure was.

Q.    Can you explain that?

A.    Well, some days I just get to hurting.  My back bothering – my left leg – just pain.  Just – I would say I wasn't feeling good.  They would tell me to go home and rest and whatever.  If I got to feeling better, come back that day.  If not, the next day to come back.

Q.    Did you get paid for that?

A.    Yes, sir.

Q.    Was this true in all three of the places?

A.    Yes, sir.  Well, not [INAUDIBLE].  I went home on my own in that one.

Q.    When you were on the job did they let you sit down and rest there?

A.    Yes, sir.

Q.    Do you have any idea how much you, just on average or typically, would have rested in a given day?

A.    Probably over two or three hours.

Q.    What were you doing during that time?  How were you resting?

A.    I just [INAUDIBLE] sometimes I leaned back. Sometimes I took a nap [INAUDIBLE] sometime.

Q.    Okay.

A.    I try to rest my legs.

Q.    All right.  That's the gin.  What about the peanut – Mid-South?

A.    About the same – the same just [INAUDIBLE].

Q.    And it sounds more like at Captain Mowing you weren't really doing any duties except just riding with somebody in the truck?

A.    Yes, sir.  Sometime I get out and pick up trash off the blacktop.  We [INAUDIBLE] –

Q.    How much would you do that in the day?

A.    Probably an hour or so or two hours.  Just depend on the

14

trash [INAUDIBLE].

Q.   When you were working with Captain Mowing, was this
near your home or did you have to stay somewhere else?

A.   I stayed out of town for a week at a time.  I stayed
somewhere else.

Q.   Were you at a motel or hotel or what?

A.   Yes.  Motel.

Q.   Did you ever have to stay behind and let everyone else
go on the job?

A.   There was a few days.  Yes, I did. . . .

(R-289-291).

In addition to the testimony of Claimant indicating that he received special treatment

at work and that his pay was somewhat subsidized, two of Claimant's former employers

submitted affidavits regarding the reason for his employ and the actual amount of work

performed by Claimant.  Additionally, two of Claimant's former co-workers testified to

Claimant's capabilities, his duties, and the amount of work he performed.

In his affidavit, Andrew R. Coulter stated that he was the President and co-owner of

CAP Mowing services, which had a contract "with the Department of Transportation of the

State of Georgia to cut grass along interstate highways within Georgia.." (R-72).  Mr.

Coulter stated that he hired Claimant to work for CAP Mowing as a tractor-mower operator

in the year 2000.  (R-73).  Although Mr. Coulter believed that Claimant "tried diligently,"

he stated:

> I realized during his first day on the job that [Claimant] was not
> physically able to do the work of a tractor-mower operator.
> After the second day, it was obvious that this work was too
> exhausting because [Claimant] was experiencing considerable
> pain from getting on and off the tractor and from trying to
> operate it.  Rather than terminate his employment, I allowed

> [Claimant] to remain on payroll, and he rode in the passenger
> seat of the safety truck and did not have any assigned
> responsibilities.  The operations of CAP Mowing Service, Inc.,
> did not require anyone to accompany the driver of the safety
> truck, and this was simply a way I could keep [Claimant] on the
> payroll.  [Claimant] was not physically able to contribute to the
> work and operations of CAP Mowing Service, Inc., and my
> decision to continue his employment was because of
> humanitarian considerations.

*Id*. Mr. Coulter stated that there were times, in the approximately four months in his employ,

when the Claimant was not even able to ride in the service truck, and "[Claimant] was

essentially permitted to be present when he felt able." *Id*.

Claimant's former employer, Roy V. Noble, Manager-President of Noble Gin, also

submitted an affidavit. (R-79-82).  Mr. noble stated that he personally hired Claimant as a

part-time unskilled laborer at Noble Gin in 1982.  (R-81).  Mr. Noble stated that Claimant

remained at Noble Gin in said capacity until 1987, when he was placed in a full-time

position.  *Id*.  Mr. Noble testified that Claimant "was allowed to work entirely at his own

pace and with the assistance he felt he needed." *Id*.  Mr. Noble testified that Claimant "was

not given any work duties that might have been harmful to him.  He was not allowed to

engage in activities such as climbing or lifting any appreciable weights." *Id*.  Mr. Nobles

testified that although Noble Gin does not even break for lunch, Claimant "was allowed to

take breaks and to rest whenever needed as determined by him," and as Claimant lived very

close to Noble Gin, "he was allowed to go home whenever he felt he needed to leave." *Id*.

Mr. Noble testified that Noble Gin and Mid-South were across the street from one another

and that Claimant would go back and forth between the Gin and Mid-South, where he was

similarly employed.  (R-82).  In his Findings, the ALJ mis-states Mr. Nobles testimony

regarding his reason for hiring and employing Claimant.  (R-46).  The ALJ states that Mr.

Nobles testimony indicates that he hired Claimant "to provide assistance as needed."  *Id*.

Mr. Nobles, however, actually testified that he employed and continued to employ Claimant

to provide financial assistance to Claimant and not to receive labor in return.  (R- 79-82).

Carolyn Thompson submitted an affidavit stating that she had been the office manager

at Mid-South Co-op, Inc. since 1987 and that Claimant had been employed by Mid-South

to provide financial assistance to Claimant and Mid-South Co-op did not expect to receive

labor in return.  (R-76-77).  In addition, Ms. Thompson appeared at the hearing and testified

that she worked with Claimant at Mid-South and stated that they kept David on as full-time

help because he needed the money to live.  (R-294).  Ms. Thompson testified that she and

the Claimant are from "a little close-knit community," where everyone knows everyone else.

*Id*.  Ms. Thompson stated:

> [O]ne of the farmer's trucks was the one that ran over David, of
> course, you know, that was beside the point, but from that time
> forward, I think the neighborhood has – with David being in the
> condition he's in, had really more or less just felt responsible to
> try to help him some, and in doing so they hire him at Mid-
> South, but Mid-South is only busy two months in the spring,
> which is April and May.  We sell peanut seed.  David – the job
> that David was doing, was writing the tickets for the peanut
> seed.

*Id*.  Ms. Thompson detailed what David's job would have been in the Spring at Mid-South

if it had been a normal situation:

> Loading peanuts seed with a forklift.  A farmer could come in

17

> and want 10 bags of peanuts of which they weighed 50 pounds a bag. That was taken off David. The forklift was taken off David, because David could not get on that forklift. So really what he was supposed to be doing, he could not do the complete job. We just let him write tickets. From May until August there's nothing to do except cut a little grass. May put out a little weed killer every now and then, and David would do this but he'd take his time.

(R-294-295). Ms. Thompson testified that some days Claimant would come into the office, announce that he was going fishing, fish for a while and then come back in and rest . (R-295). Ms. Thompson testified that people joked with the Claimant that they were "going to put a seatbelt on his chest so [he wouldn't] won't fall out [of his chair] while he was sleeping." *Id*. Ms. Thompson testified that they would get busy again in August and that David was very knowledgeable about what needed to be done. *Id*. The implication from Ms. Thompson's testimony appears to be that Mid-South would bring in people to cover Claimant's responsibilities and then Claimant "would more or less just go out and look to see what they were doing and tell them what to do and then he'll come back in and sit in his chair again." *Id*. Ms. Thompson also testified that Claimant was "more or less responsible for checking the moisture of the peanuts," which would entail "going and climbing on the wagon, taking a sample into a bucket, shelling peanuts out of the jar, and then bringing the peanuts in." *Id*. Ms. Thompson testified that Claimant's condition prevented him from performing all of his duties, therefore, they would "have somebody to get the peanuts for [Claimant], to get them shelled for him, and bring them in to him." *Id*. Ms. Thompson also detailed what Claimant's responsibilities entailed regarding "weighing wagons." (R-295-

18

296).  Ms. Thompson testified that the directors at Mid-South allowed Claimant to take his time and do whatever he felt necessary as far as getting rest.  (R-297).  Ms. Thompson testified that due to his limitations, other employees had to perform many of Claimant's duties at Mid-South.  (R-297).  Specifically, Ms. Thompson testified that other employees had to  load the peanut seed with a forklift and also load individual 50 pound bags, because there was "no way [Claimant] could lift 50 pounds without rupturing himself."  *Id*.  Ms. Thompson also testified that "[w]hen they cleaned out the wagons at the end of the year, [Claimant] went out there occasionally to check one or two of them as they cleaned them out, because he could not get in those wagons to clean them out."  (R-297-298).  Ms. Thompson testified that Claimant worked at Mid-South full-time from 1987 until 1996.  (R-298).  Ms. Thompson testified that in 1996, Claimant began working with Mid-South from August until November only and continued in this pattern until "he just got to the point where he absolutely could not go."  *Id*.  Having worked with Claimant for several years, Ms. Thompson noted that Claimant's condition had gotten worse over the years, stating "When he first came there, [Claimant] wasn't nearly as – I guess with age, we all get a little bit, as I say stiff or hurting in the joints, but [Claimant] wasn't near as disabled then as [he] is now. And [Claimant] just kept increasingly getting worse."  *Id*.

The Administrative Law Judge also received testimony from Mrs. Betty I. Coulter, who was a former co-worker of Claimant's and the wife of Claimant's former boss at Captain Mowing.  (R-302-307).  Mrs. Coulter testified that:

> Mid-South Cooper and Royal [INAUDIBLE] Company, as we

19

say in south Georgia, they are hollering distance of each other. So, and then, [Claimant] live[d] in hollering distance down the road the other way. So, it's like one big happy family in a small community , and David was so dear to everybody and they just looked after him at Mid-South just like they did me. As far as Andy hiring him, Andy needed a crew. He had a contract with the state highway department mowing the interstates. . . . [Claimant] was more or less, I think, entertainment for Andy. They stay in a motel Monday through Fridays. Some days, you know, [Claimant] needed to, he'd go back to his motel – Andy would take him back. My husband is real good natured, plus he had to live with me, and I wanted [Claimant] to have an income. So that's basically what it was. . . . Well, Andy was hoping that [Claimant] would be able to drive a tractor, because [Claimant] is knowledgeable and knows about farm equipment because he grew up in it. But he couldn't do it, and it was too dangerous on the interstate. So – and Andy just – he had – he just couldn't let him go. He just kept him on payroll. He and two other – Captain Mowing was Coulter, Achin, and Pedi. It was he and two of his friends and they all knew – I mean, they were all friends of [Claimant's].

(R-304-305). When questioned as to Claimant's ability to perform on the job, Mrs. Coulter

testified, "[w]ell, he wore out several chairs. He – physically he just can't hold out. His one

leg is a lot shorter than the other one. He has a problem walking. He has a problem sitting.

He can't climb. He can't lift. His mind works good." (R-305). Mrs. Coulter testified that

at least half of the time, sometimes more, Claimant was sitting on the job not doing anything

versus being engaged in some sort of work activity. (R-306). Mrs. Coulter also testified that

Claimant would put chairs together to lie down or sometimes he would simply prop up. *Id*.

Mrs. Coulter testified that his co-workers "all tried to cover for [Claimant] and do what we

could to keep the job going during the busy season." *Id*. Claimant's attorney questioned

Mrs. Coulter asking, "[a]s far as what you might ordinarily hire one person to go and do and

carry out all of the activities to be associated with one person's job, how did [Claimant] fit in with that and what was he able to do?"  *Id*.  In response, Mrs. Coulter testified:

> The job that [Claimant] was hired for, on person – one normal person could of done it, but Mid-South had to have somebody to fill in the gaps because David couldn't climb up on the wagon to pull the samples.  He couldn't hook and unhook the wagons and move them to where they were supposed to go.  So two to three people had to do the job that actually [Claimant] was hired to do, but nobody seemed to mind.

*Id*.  Mrs. Coulter also testified that during the cotton and peanut seasons, that the employees, including herself, would be "wide open," often working from six o'clock a.m. to midnight. (R-307).  She testified that Claimant never worked those hours though, that he was "back and forth" and "[i]f he needed to go home and lay down, he could, or he could fix him a bed there at Mid-South or chairs or whatever."  *Id*.  Finally, Mrs. Coulter testified that although they were wide open during the season, there was absolutely nothing to do during the off season.  *Id*.

Code section 404.1574(a)(1) states that all earnings will be counted towards substantial gainful activity, unless the administration receives information from a Claimant, a Claimant's employer, or others, that shows that not all earnings should be counted.  20 C.F.R. §404.1574(a)(1).  Claimant provided his own testimony, affidavits from two employers and the testimony of two of his former co-workers to show that not all of his income was "directly related to [his] productivity."  20 C.F.R. §404.1574(a)(2).  When a Claimant's earnings exceed the reasonable value of his work actually performed, the only part of his pay considered for substantial gainful activity purposes, is that which he actually

earned.  *Id*.  Under the code, work is considered to be subsidized if the "true value of your work, when compared with the same or similar work done by unimpaired persons, is less than the actual amount of earnings paid to you for your work."  *Id*.  If earnings are being subsidized, the Social Security Administration will not consider the amount of the subsidy when determining if a Claimant's earnings show that he has performed substantial gainful activity.  *Id*.  After receiving information that not all of Claimant's earnings should be considered, the ALJ is first required to determine whether Claimant was receiving a subsidy. *See* 20 C.F.R. §404.1574(a)(1) and (2).  The ALJ must also apply the criteria in 20 C.F.R. §404.1574(b)(6), regarding comparability and value of services.  *See* also 20 C.F.R. §404.1574(b)(5).  The comparability test requires the ALJ to acquire the necessary information to determine if Claimant's work was "comparable to that of unimpaired people in [his] community who are doing the same or similar occupations as their means of livelihood, taking into account the time, energy, skill, and responsibility involved in the work."  20 C.F.R. §404.1574(b)(6)(iii)(A).  The value of services test inquires whether a claimant's work, "although significantly less than that done by unimpaired people, is clearly worth the amounts shown in paragraph (b)(2) of this section, according to pay scales in your community."  20 C.F.R. §404.1574(b)(6)(iii)(B); *See also* 20 C.F.R. §404.1574(b)(2).

The sworn affidavits and testimony from the Claimant, his employers, and two former co-workers clearly falls under "Determining Countable earnings" in S.S.R. 83-33(A)(1)(a)(5), as one of the circumstances that indicate the strong possibility of a subsidy. Therefore, the ALJ was required to apply the tests of comparability and value of services to

determine Claimant's "countable earnings."  The ALJ failed to discuss the requisite factors or follow the proper procedures under 20 C.F.R. §404.1574, which cannot be considered harmless error.  This case should be remanded to properly determine Claimant's "countable earnings" for the years 2000, 2001, and 2002.  As to the recently submitted evidence by the Commissioner, it was not necessary to consider said evidence during this court's review, the ALJ, however, should use the most current information from the Department of Labor to properly determine Claimant's earnings for the years stated above.

## CONCLUSION

In reviewing the record, error is found which substantiates Claimant's contentions that the ALJ improperly determined that he had substantial gainful activity for the years 2000, 2001, and 2002.  The decision of the Commissioner was not supported by substantial evidence.

**WHEREFORE**, **IT IS RECOMMENDED** to the United States District Judge that the decision of the defendant Commissioner of Social Security be **REMANDED**.

Pursuant to 28 U.S.C. § 636(b)(1), Claimant may serve and file written objections to this recommendation with the UNITED STATES DISTRICT JUDGE within ten (10) days after being served a copy of this recommendation.

THIS the 9rd day of August, 2006.


S/ G. MALLON FAIRCLOTH
UNITED STATES MAGISTRATE JUDGE

mZc

23